445 Mass. 411 (2005)                                        411

Twin Fires Investment, LLC *v.* Morgan Stanley Dean Witter & Co.

## Twin Fires Investment, LLC, & another[1] *vs.* Morgan Stanley Dean Witter & Co. & another.[2]

Suffolk. September 7, 2005. - November 30, 2005.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Contract,* Condition precedent, Misrepresentation. *Corporation,* Initial public offering. *Damages,* Breach of contract, Consumer protection case. *Consumer Protection Act,* Damages, Unfair or deceptive act, Attorney's fees.

In a civil action brought by plaintiff investors asserting claims of breach of contract, fraudulent misrepresentation, and violation of G. L. c. 93A, § 11, against a national brokerage firm on the ground that the firm did not allocate shares of a technology company's stock to them on the morning of an initial public offering, contrary to the plaintiffs' expectations, the trial judge correctly concluded that an unfulfilled condition precedent vitiated the contract claim [419-423], and that the plaintiffs were entitled to recover, on their misrepresentation claim, damages calculated on a theory of reliance rather than the benefit of the bargain, trebled under G. L. c. 93A [423-427]; further, in the circumstances, the judge did not abuse his discretion in awarding to the plaintiffs $1 million in attorney's fees and costs, an amount nearly ten times more than the damages award [427-432].

This court awarded appellate attorney's fees and costs to plaintiffs for their successful defense of their award of attorney's fees and costs under G. L. c. 93A. [432-433]

Civil action commenced in the Superior Court Department on February 22, 2000.

The case was heard by *Ralph D. Gants*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Robert D. Friedman* (*Susan E. Stenger & Andrew F. Caplan* with him) for the plaintiffs.

*William Pratt* (*Eric F. Leon & David I. Horowitz,* of New York, *John R. Snyder & Carol E. Head* with him) for the defendants.

[1] Stephens W. Dunne.

[2] Andrew Finch.

MARSHALL, C.J. The issue in this case is whether the plaintiffs, who sought to benefit from a technology company's initial public offering (IPO), are entitled to recover a claimed loss of over $12 million from a national brokerage firm because, contrary to the plaintiffs' expectations, the firm did not allocate shares of the company's stock to them on the morning of the IPO.

The plaintiff, Twin Fires Investment, LLC (Twin Fires), organized by the plaintiff Stephens W. Dunne and others for the purpose of purchasing the shares at issue, sued stockbroker Andrew Finch and his employer Morgan Stanley Dean Witter & Co. (Morgan Stanley)[3] for, inter alia, breach of contract, fraudulent misrepresentation, and violation of G. L. c. 93A, § 11.[4]

The dispute concerns an IPO of common stock of web-Methods, Inc. (WEBM), a Virginia-based technology company specializing in business-to-business communication. On the first day of its IPO, WEBM's shares rose from $35 per share to $212 per share, allowing initial investors who sold their shares within hours to secure an immediate profit of some six times the initial purchase price. The plaintiffs claimed that the defendants breached a contractual obligation to allocate 75,000 IPO WEBM shares to them, resulting, it is claimed, in a one-day loss of over $12 million.

---

[3]Both at trial and on appeal the defendants were represented by the same counsel. Morgan Stanley conceded that it was vicariously liable for Finch's actions as a Morgan Stanley broker.

[4]The plaintiffs also alleged violations of the Massachusetts "blue sky" laws, G. L. c. 110A, §§ 101 and 410; negligent misrepresentation; breach of the covenant of good faith and fair dealing; breach of fiduciary duty; negligence; interference with advantageous relations; specific performance; and control person liability under the Massachusetts securities laws, G. L. c. 110A, § 410 (*b*). Their claim for intentional interference with an advantageous business relationship was dismissed before trial. In his posttrial memorandum and order the judge determined that the plaintiffs' ten remaining counts comprised four legal theories that could warrant an award of damages: (1) breach of contract or promissory estoppel; (2) intentional or negligent misrepresentation; (3) violation of the Massachusetts blue sky law, G. L. c. 110A; and (4) violation of G. L. c. 93A. The parties do not challenge his ruling in this regard. The judge entered judgment for the defendants on the Massachusetts blue sky law claim, a ruling that is also uncontested on appeal. The remaining three issues are the focus of this appeal.

Following a jury-waived trial, a judge in the Superior Court denied the contract claim, awarded the plaintiffs reliance damages for fraudulent misrepresentation in the amount of $39,650[5] and treble damages in the amount of $118,950, together with attorney's fees and statutory costs in the amount of $1 million for violations of G. L. c. 93A, § 11. All parties appealed from the resulting judgments entered in the Superior Court. We granted the plaintiffs' application for direct appellate review. For the reasons we discuss below, we affirm the judgment in all respects.

1. *Factual background.* The trial took place over nine days, with thirteen witnesses, fourteen depositions, and numerous exhibits submitted in evidence. We summarize the judge's careful and detailed findings of fact, which are fully supported by the evidence.

a. *The selection of Morgan Stanley as lead underwriter.* In 1998, Finch, a registered financial advisor, began working as a stockbroker in the Wellesley office of Morgan Stanley.[6] In 1999, Finch's compensation was not substantial. The judge found that a stockbroker generally receives between twenty-five and forty per cent of his annual production in compensation. Finch's annual production for 1999 was $67,453, placing him among the bottom third of the forty-five brokers in the Wellesley office.

In March, 1999, Finch learned through a friend that Phillip Merrick, WEBM's chief executive officer, was considering an initial public offering of WEBM. On his own initiative Finch contacted Merrick, and subsequently participated in discussions between Merrick and Morgan Stanley concerning a public offering of WEBM shares. When WEBM selected Morgan Stanley as its lead underwriter, Finch was declared the "originator" of the transaction under Morgan Stanley's branch originator

[5]The judge referred to the misrepresentation as "fraudulent" and "intentional." In awarding reliance damages, the judge noted that he did not need to consider whether Finch's intentional misrepresentations could also be deemed negligent misrepresentations because the measure of damages would be the same.

[6]Finch was a relatively inexperienced stockbroker. The judge found that he had graduated from Boston University in 1994 and had worked for one year at the brokerage firm of Joseph Charles & Associates before joining Morgan Stanley in 1998.

program, an incentive structure that encouraged retail brokers to explore with their financial service clients opportunities for the firm to act as an investment banker.[7]

The judge found that Finch was anxious to secure the maximum benefit for himself as the "originator" of the WEBM relationship with Morgan Stanley. Based on Finch's discussions with other Morgan Stanley brokers and on his understanding of the opportunities open to him as an "originator," Finch came to believe that he would be eligible for an extra allocation of WEBM IPO shares for his own clients. He learned that any substantial increase in an extra allocation of shares for his own clients would, however, have to come from a special request made by Merrick on Finch's behalf. Finch thus came to believe that if he cultivated his relationship with Merrick, Merrick might procure a substantial special allocation of WEBM IPO shares for Finch.[8] Morgan Stanley generally honored a request

---

[7]The judge found that Morgan Stanley deemed a retail broker who identified a lead with a company with which Morgan Stanley had no prior relationship, and who influenced the company to retain Morgan Stanley as its investment banker, the "originator." As the originator of the WEBM IPO, Finch became eligible under Morgan Stanley's procedures to receive a "finder's fee" of up to ten per cent of all revenue derived from the transaction by Morgan Stanley, capped at $500,000. The originator might also have the opportunity to increase his annual compensation by becoming the broker for the WEBM directed shares program, which would entitle him to commissions from IPO shares directed specially to officers, employees, and friends of the issuing company. As originator of the IPO, Finch would also, the judge found, have the opportunity to develop his relationship with Merrick in an attempt to become the chief executive officer's personal financial advisor at Morgan Stanley. The judge found that Morgan Stanley arranged for Finch to split the directed shares program (and attendant commissions) with a Morgan Stanley broker in Virginia, and that Morgan Stanley's private wealth management group in New York ultimately "won" Merrick's personal account.

[8]At the time of WEBM's IPO, there was phenomenal growth in the value of technology stocks, particularly IPOs. The judge found that "the purchase of shares in a technology IPO at the initial offering price, combined with a quick exit strategy, was as close to a guarantee of a huge short-term profit as life offers in the stock market." Serving as underwriters for an IPO, investment banking firms such as Morgan Stanley controlled, to a large extent, the allocation of shares in the IPO. Morgan Stanley recognized the attraction for investors of the opportunity to buy technology stocks at the initial offering price. As a result, it carefully allocated those shares among its retail branches and private wealth management group, a separate retail brokerage group, reserving many of what the judge termed "tickets to wealth" for its best customers.

from an issuing company's chief executive officer (such as Merrick) for a special allocation to a person, entity, or broker the chief executive officer wished to reward. The judge found that from conversations with his colleagues, Finch also came to believe that if the WEBM IPO occurred, he would "probably" receive a special allocation of shares from Merrick, and that the special allocation "could" be as great as 300,000 shares. Accordingly, Finch spent the succeeding months attempting to solidify his relationship with Merrick in anticipation of the IPO. The judge found, however, that if Finch directly broached the issue of a special allocation with Merrick prior to the IPO (a point on which the testimony sharply conflicted), Merrick was probably noncommittal.

During the summer and fall of 1999, Finch discussed the prospective WEBM IPO with several clients, as well as with his friends and family. As the judge found, he "boasted" to them that he was working closely with, and that he would receive a large allocation of IPO shares from, WEBM's chief executive officer. The judge found that Finch told several clients in Texas that he would have a large enough allocation of WEBM stock to sell them $325,000 worth of shares.[9] These conversations contradicted the express terms of Morgan Stanley's securities policy, which stated that, without obtaining special permission,

---

Morgan Stanley further distributed shares among individual stockbrokers working at each branch. The judge found that a junior broker such as Finch was likely to be allocated a relatively small number of shares to distribute among his customers.

[9] As explained in Morgan Stanley's compliance guide, and as Finch should have known, there were specific procedures in place at Morgan Stanley to be followed regarding IPO sales, in part to comply with State and Federal regulation of the sale of securities. After the "preeffective registration" of an IPO and during the "quiet period," Morgan Stanley stockbrokers could solicit a "general expression of interest" for an IPO, but could make no assurances or guarantees that a specific number of shares would be allocated to them. During the quiet period, brokers were not permitted to promise to a particular client to sell or to accept payment for such shares, nor could brokers confirm such sales. On the announcement that the final prospectus was to be issued, Morgan Stanley allocated IPO shares among its branches, which in turn allocated shares among its brokers. Brokers then allocated the shares among clients who had provided a general expression of interest, all as required by § 5 of the Securities Act of 1933, 15 U.S.C. § 77e(c) (2000), which prohibits the sale of securities before a registration statement has become effective.

a retail client could not be allocated more than 1,000 shares in what the judge termed any "hot" IPO, such as WEBM.[10]

b. *Dunne's interest in the WEBM IPO.* Dunne learned of the potential WEBM IPO and Finch's role in it in December, 1999, through Dunne's brother, who was married to Finch's sister. Although not an active investor in the securities market, Dunne was the son of a stockbroker and the beneficiary of family trusts. The judge found that, having followed the trust funds' performance over the years, Dunne had some experience in the investment market.

We now summarize the judge's findings concerning the communications between Dunne and Finch that are the basis of the claims asserted in this action. There were no written documents evidencing their communications.[11] As to oral communications, the judge found that on or about January 17, 2000, Dunne first telephoned Finch about the prospective WEBM IPO, and between that date and February 11, 2000, the date of the IPO, Finch and Dunne had several conversations by telephone and in person.[12] These discussions led Dunne to believe that as a result of a large special allocation of stock that Finch would receive through Merrick, he (Dunne) would be able to purchase a large number of WEBM IPO shares. Finch asked Dunne whether he wished to "take" 75,000 of WEBM's shares, and Dunne said that he did. Finch then asked Dunne whether he could "handle" an additional 75,000 shares. Again Dunne answered in the affirmative. As found by the judge, Finch "warned" Dunne that Finch could not be sure that he would receive the "additional" shares.

Dunne told Finch that he would form a limited liability company as an investment vehicle to purchase the WEBM shares. Subsequently Dunne opened an account at Morgan Stan-

---

[10]The judge found that this policy was poorly communicated within Morgan Stanley, and that Finch was not aware of the policy prior to the WEBM IPO.

[11]The judge found that the absence of writing was not unusual, as "agreements in the securities industry are virtually always made orally, regardless of their size, and confirmed in writing only after the transaction has been completed."

[12]The parties vigorously disputed the content of those communications. The judge explicitly credited some, but not all, of each principal witness's testimony.

ley for the investment vehicle, Twin Fires.[13] Beginning on February 8, 2000, Twin Fires's investors — including Dunne's accountant and business advisor, Rick Dlugasch; the wife of an associate of Dlugasch; and Dunne's family members — sent multiple wire transfers for deposit into their account at Morgan Stanley. On February 10, 2000, the day before the IPO, Finch confirmed to Dlugasch that $1.5 million had been deposited. Dlugasch told Finch that more money was in transit, and that Twin Fires was in a position to obtain further funds quickly if an additional allocation of shares became available.

   c. *The public offering of WEBM shares.* The judge found that in the weeks preceding WEBM's initial public offering, Finch's expectations for a large allocation of shares "had to diminish." On January 5, 2000, Finch wrote to Merrick asking that Finch be allocated up to 100,000 shares of the IPO, but weeks passed with no response from Merrick. Despite Merrick's silence, by February 10, Finch still believed that there was a "possibility" he would receive a large special allocation of the IPO shares. Finch, however, did not inform would-be investors of his waning expectations.

   At approximately 6:30 P.M. on February 10, 2000, the WEBM IPO registration statement became effective, the initial offering price was set at $35 a share, and public trading was scheduled to begin the following day. Earlier that day Finch learned from his Wellesley branch manager that Finch's branch allotment of WEBM stock would be only 225 shares. That night, Finch informed Dunne that the IPO had been priced at $35 per share. Dunne asked whether Finch knew anything more about share allocation. Finch said that he did not, and that he would learn more the next day. The judge found that Dunne believed this statement of Finch's to refer to a possible allocation beyond the 75,000 shares Dunne expected he would be able to purchase.

   On the morning of February 11, Dunne and other Twin Fires investors gathered to celebrate the beginning of public trading, and to execute the quick exit strategy they had devised. Copies of electronic messages introduced in evidence indicated that by

---

[13]The judge found that Twin Fires asked for and received an assurance from Finch that any money deposited in Twin Fires's investment account at Morgan Stanley would receive interest.

418                                    445 Mass. 411 (2005)

Twin Fires Investment, LLC *v.* Morgan Stanley Dean Witter & Co.

9 A.M. that morning, Finch knew that he would receive no special allocation of shares. Yet when Dunne called Finch at approximately 10:40 A.M., in anticipation of the opening of public trading scheduled for 11 A.M, Finch told him that trading had been delayed until 2 P.M. by a question of share allocation involving another company, but that this did not pose any threat to Twin Fires's purchase of 75,000 shares.[14] Then, in a telephone conversation with Dunne at approximately 1:10 P.M., Finch "congratulated" Dunne, and appeared to accept Dunne's orders to sell 30,000 WEBM shares, which Dunne believed (incorrectly) he had bought.

Later that same afternoon, when Dunne telephoned Finch with an order to sell the "remaining" 45,000 shares, Finch informed Dunne that Dunne had no shares to sell. Finch told Dunne for the first time that Merrick had not authorized a special allocation of shares to him. Stunned, Dunne telephoned Morgan Stanley's Wellesley office to try to reach the branch manager. On being transferred instead to the branch's compliance manager, he demanded that she "rectify the situation." Following various demands by the plaintiffs on Morgan Stanley, this litigation commenced.

2. *The judge's conclusions of law.* The judge concluded that the parties had entered into an oral agreement that was not enforceable because it contained an "implicit" and unrealized condition precedent: that Finch would receive a special allocation of at least 75,000 WEBM IPO shares.[15] He entered judgment for Morgan Stanley and Finch on the contract claim.[16] On the claim for fraudulent misrepresentation he entered judgment

---

[14]The judge did not explicitly find that Finch's statement regarding the delayed opening was false. Dunne discovered at 1 P.M. that trading of the WEBM shares had begun.

[15]The judge also explained that "the distinction between a condition precedent and a condition subsequent is often hard to understand." While he viewed the special allocation of at least 75,000 shares of WEBM to Finch as a condition precedent, he stated that "it would not affect this decision if it were viewed as a condition subsequent." The plaintiffs vigorously challenge the judge's ruling that the condition precedent defeats their agreement with Finch, but no party suggests that whether the issue is one of a condition "precedent" or a condition "subsequent" is of any consequence to the final determination of the case.

[16]The judge concluded that whether the claim was characterized as breach

jointly and severally against the defendants, and awarded the plaintiffs reliance damages in the amount of $39,650.[17] The judge also found that the defendants' conduct amounted to a knowing and wilful violation of the provisions of G. L. c. 93A, and awarded punitive (treble) damages in the amount of $118,950.

The plaintiffs then moved for an award of attorney's fees and costs as provided in G. L. c. 93A, § 11. After submissions from the parties and a nonevidentiary hearing, the judge determined that the plaintiffs should be awarded $1 million as reasonable attorney's fees and costs, and entered an amended judgment accordingly.

3. *Discussion.* The plaintiffs argue that the judge erred as a matter of law in determining that an unfulfilled condition precedent vitiated the contract claim. They also contend that the judge applied the incorrect measure of damages in awarding reliance rather than benefit of the bargain damages on the claim of misrepresentation. The defendants in turn contend that the judge abused his discretion in awarding the plaintiffs $1 million in attorney's fees and costs. Neither party has given us reason to overturn any aspect of the judgment, which is supported by detailed, meticulous findings of fact.

a. *The condition precedent to the agreement.* We turn first to the contract claim, and begin with the standard of review. The plaintiffs are incorrect to characterize the judge's contract determination as a matter of law subject to de novo review. "Ordinarily the question whether a contract has been made is one of fact," unless the evidence "consists only of writings, or is uncontradicted." *Situation Mgt. Sys., Inc.* v. *Malouf, Inc.*, 430 Mass. 875, 879 (2000), quoting *David J. Tierney, Jr., Inc.* v. *T. Wellington Carpets, Inc.*, 8 Mass. App. Ct. 237, 239 (1979).

---

of contract or promissory estoppel premised on reliance was immaterial because his finding of an unfulfilled condition precedent would defeat either claim.

[17]The judge noted that the evidence as to reliance damages was "sparse and undocumented." He derived the damage figure from evidence of money expended to establish Twin Fires as an investment vehicle for the purchase of WEBM IPO shares. The total includes $16,000 in legal fees for work performed by the plaintiffs' attorneys and $23,650 in accounting fees. Morgan Stanley does not challenge the amount of reliance damages.

Where, as here, the terms of an oral agreement are in dispute, the finder of fact determines the terms of any agreement "from the conversation of the parties and their conduct." *Goldstein* v. *Katz,* 325 Mass. 428, 430 (1950). See *Murphy* v. *Nelson,* 306 Mass. 49, 50 (1940). Where the dispute concerns a condition precedent, "a court looks to the parties' intent to determine whether they have created a condition precedent. To ascertain intent, a court considers the words used by the parties, the agreement taken as a whole, and surrounding facts and circumstances." (Citations omitted.) *Massachusetts Mun. Wholesale Elec. Co.* v. *Danvers,* 411 Mass. 39, 45-46 (1991).

The judge carefully and in great detail explicated his findings that the oral contract contained an implicit condition precedent. In summary, the judge found that at some point during their January meetings, Finch and Dunne reached an agreement whereby Dunne would have the opportunity to purchase 75,000 WEBM IPO shares. Implicit in the agreement, the judge found, were two conditions precedent. First, the IPO would have to materialize, and second, Finch would have to receive a special allocation from Merrick of at least 75,000 shares.[18]

On appeal, we are bound by a judge's findings of fact that are supported by the evidence, including all inferences that may reasonably be drawn from the evidence. See *Judge Rotenberg Educ. Ctr., Inc.* v. *Commissioner of the Dep't of Mental Retardation,* 424 Mass. 430, 452 (1997). The judge's findings will be set aside only if clearly erroneous. Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996). See *New England Canteen Serv., Inc.* v. *Ashley,* 372 Mass. 671, 675 (1977).

"A condition precedent defines an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract. If the condition is not fulfilled, the contract, or the obligations attached to the condi-

---

[18]The plaintiffs do not challenge as clearly erroneous the judge's finding in this regard. Rather, they contend that whether the terms of the agreement as the judge found them operate as a condition precedent that vitiated the contract is a question of law subject to de novo review. In the alternative, Twin Fires argues that the existence of a condition precedent merits de novo review either because it is an "ultimate finding" or because the condition precedent should be viewed as comprised of terms not in dispute. For the reasons we discuss, those arguments fail.

tion, may not be enforced." *Massachusetts Mun. Wholesale Elec. Co.* v. *Danvers, supra* at 45. See 13 S. Williston, Contracts § 38.1, at 367 & n.8 (4th ed. 2000), quoting *Lach* v. *Cahill,* 138 Conn. 418, 421 (1951) ("If the condition is not fulfilled, the right to enforce the contract does not come into existence"); Restatement (Second) of Contracts § 225 (1981). In this case the evidence of the unfulfilled condition precedent (Finch's receipt of a special allocation from Merrick of at least 75,000 WEBM IPO shares) was disputed and consists entirely of oral communications between Dunne and Finch.[19] Where the resolution of a factual dispute turns on the credibility of the witnesses, as this surely did, the parties' intentions must be deduced from their testimony. In such circumstances we accord particular deference to the judge's findings. See *First Pa. Mtge. Trust* v. *Dorchester Sav. Bank,* 395 Mass. 614, 621 (1985); Mass. R. Civ. P. 52 (a) ("due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses"). Where, as here, the parties dispute the content of oral conversations that comprise an agreement, an appellate court is decidedly not positioned as well as the trial judge to determine its terms. Cf. *Shaw* v. *Commercial Ins. Co.,* 359 Mass. 601, 606 (1971) (in interpreting written contract, appellate court is in "as good a position as the trial judge").

We have examined most carefully the voluminous and contradictory testimony of the witnesses concerning their key communications and are satisfied that the record fully supports the judge's careful findings of fact.[20] The judge considered the agreement as a whole, taking into account the surrounding facts

---

[19]At trial Morgan Stanley argued vigorously that any agreement it entered into during the quiet period to sell 75,000 WEBM IPO shares to Twin Fires was unenforceable because it lacked mutuality of consideration. The judge did not adopt this argument, which is not pressed on appeal and is therefore waived. See *Sullivan* v. *Liberty Mut. Ins. Co.,* 444 Mass. 34, 38 n.9 (2005); Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

[20]The judge indicated that "the outcome of this case rests largely on Finch's choice of words" in his conversations and meetings, and noted that "[s]eparating out what was truly said from what the witness understood was meant" was particularly difficult. In addition to his credibility determination, the testimony of other potential investors supports the judge's finding of a condition precedent. As the judge found, Finch led three Texas clients to believe they would be able to purchase WEBM IPO shares from a special allocation Finch would receive from Merrick.

and circumstances as he was obliged to do. See *Massachusetts Mun. Wholesale Elec. Co.* v. *Danvers, supra* at 45-46. He reviewed, among other things, Morgan Stanley's written policies and the implementation of those policies; Finch's determination to exploit his position as an originator; Dunne's degree of experience as an investor; and the overheated market for technology stocks that existed at the time.

Specifically, the judge found that Twin Fires investors knew that "they could not obtain 75,000 IPO shares in WEBM by simply walking into Morgan Stanley's Wellesley branch, opening an investment account in the name of Twin Fires, asking for a random broker, and directing that broker to purchase 75,000 shares of WEBM at the initial offering price." The investors knew that the opportunity to obtain coveted shares in a technology IPO was not available to every investor. They understood that they would be able to purchase 75,000 shares of WEBM at the initial public offering only because they had found a stockbroker who had brought the IPO to Morgan Stanley and could, as a reward, receive a large special allocation of shares to sell on a special request from the offering company's chief executive officer.[21]

In summary, the judge found that Dunne understood that he could purchase 75,000 WEBM IPO shares if, and only if, the IPO materialized, and if, and only if, Finch received a special allocation from Merrick in at least that amount.[22] That Finch led Dunne to understand (falsely) that Finch would receive at least

[21]The plaintiffs argue that even if a special allocation to Finch was a condition of their agreement with Morgan Stanley, Morgan Stanley prevented the condition from occurring by not allocating 75,000 shares itself for purchase by Twin Fires. In light of the judge's finding, fully supported by the evidence, that Twin Fires's investors understood that Finch himself would have to receive a special allocation of shares from Merrick in order for Twin Fires to purchase 75,000 WEBM IPO shares, this argument is unavailing. Twin Fires's assertion, which it supported with case law, that ownership of an item for sale is not an implied condition precedent to a contract to sell the item is similarly unpersuasive, given the judge's explicit finding that this contract did contain a condition precedent.

[22]While not determinative in this case, which rests on the terms of an oral contract, investors are charged with understanding the contents of a prospectus they receive. The judge found that the preliminary prospectus received by Twin Fires on February 4, 2000, contained "on its first page, vertically and in red," the following declaration:

75,000 WEBM IPO shares goes to the plaintiffs' fraudulent misrepresentation claim and not to the contract claim: the judge did not find that Finch agreed to sell Dunne (Twin Fires) 75,000 shares regardless of any special allocation from Merrick. The judge correctly concluded that if Finch did not receive the special allocation, in his own words, "consummation of the contract would become impossible."[23] Based on the totality of the evidence, including the reasonable inferences to be drawn therefrom, "we are not left with a firm conviction that the trial judge was mistaken." *First Pa. Mtge. Trust* v. *Dorchester Sav. Bank, supra* at 622.

b. *Finch's misrepresentation concerning a special allocation of IPO shares.* Misrepresentation may exist independent of a contractual relationship between the parties. Among other differences, a contract requires a "meeting of the minds," *Nelson* v. *Rebello*, 26 Mass. App. Ct. 270, 272 (1988), whereas fraudulent or intentional misrepresentation exists where one party misleads another. See *Kilroy* v. *Barron*, 326 Mass. 464, 465 (1950) (to recover for intentional misrepresentation, plaintiff must "allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage").

Morgan Stanley does not challenge the judge's finding that

---

"The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and we are not soliciting offers to buy these securities in any state where the offer or sale is not permitted."

The judge also found that there was nothing in the prospectus that "would reasonably inform anyone that Finch could not promise to sell WEBM IPO shares prior to the effective date of the registration statement as long as the actual sale occurred after the effective date."

[23] The plaintiffs claim to have been prejudicially surprised by the judge's finding that the agreement contained an implied condition precedent. The plaintiffs had adequate notice of the defense, which was specifically pleaded. There was, moreover, substantial testimony concerning the circumstances in which Finch would receive an allocation of shares to sell to the plaintiffs. There was no surprise.

Finch knowingly misrepresented to Twin Fires the likelihood that he would obtain a special allocation of WEBM shares from Merrick. Nor does Morgan Stanley challenge the findings that Finch knew his representation to be false; the representation concerned a fact material to the plaintiffs; and the plaintiffs reasonably relied on this representation to their detriment. See, e.g., *Kilroy* v. *Barron, supra.*

The sole issue on the misrepresentation claim is whether, as the plaintiffs assert, the judge erred in applying the measure of damages. The judge awarded the plaintiffs reliance damages of $39,650. He calculated the amount based on the plaintiffs' expenditures associated with their preparations to purchase the WEBM IPO shares. See note 17, *supra.* The plaintiffs contend that rather than reliance damages, they should have received "benefit of the bargain" damages,[24] which would result in an award approaching $13 million.[25]

The measure of damages is a question of law reviewed de novo on appeal, see *Burke* v. *Rivo*, 406 Mass. 764, 764-765 (1990) (proper measure of damages recoverable in tort is question of law), but the amount of damages awarded is a factual issue reviewed on appeal under an abuse of discretion standard. See *Bartley* v. *Phillips*, 317 Mass. 35, 43 (1944). As this court explained in *Bartley* v. *Phillips, supra,* "an award of damages must stand unless to make it or to permit it to stand was an

---

[24]"Benefit of the bargain" damages refers to the difference in the value between what a plaintiff has received "and the actual value of what he would have received if the representations had been true." See *Rice* v. *Price*, 340 Mass. 502, 507 (1960), and cases cited. Generally, benefit of the bargain damages are awarded in business transactions only where proved with reasonable certainty, see *Goldman* v. *Mahony*, 354 Mass. 705, 709 (1968), and where out-of-pocket damages would not afford just and satisfactory compensation because one party is "left with something acquired under the transaction which, because of the matter misrepresented, he does not want and cannot use." See Restatement (Second) of Torts § 549 (2) comment g (1977).

[25]The initial offering price for WEBM was set at $35 per share on February 10, 2000. On February 11, Dunne issued a sales order at around 1:10 P.M. to sell 30,000 shares at the market price of $207, and a second sales order at 2:50 P.M. to sell 45,000 shares at the market price of $197.85. Because Finch did not obtain the 75,000 shares for Twin Fires, both sales orders were futile. Based on the average price at which WEBM IPO shares were sold at the times Dunne gave the orders to sell the shares, Twin Fires claimed lost profits of $12,487,940.

abuse of discretion on the part of the court below, amounting to an error of law" (citations omitted). An abuse of discretion "consists of judicial action 'that no conscientious judge, acting intelligently, could honestly have taken.' " *Id.*, quoting *Davis* v. *Boston Elevated Ry.*, 235 Mass. 482, 502 (1920). We first discuss the measure of damages.

The plaintiffs are correct that in cases of fraudulent or intentional misrepresentation, the usual rule, at least in appropriate cases, is that the injured party receives benefit of the bargain damages. See *Rice* v. *Price*, 340 Mass. 502, 507 (1960). See also *Goldman* v. *Mahony*, 354 Mass. 705, 709 (1968); *Anzalone* v. *Strand*, 14 Mass. App. Ct. 45, 48 (1982). That rule is not absolute. See *Rice* v. *Price*, *supra* at 509. In rejecting the plaintiffs' request for benefit of the bargain damages, the judge cited the principle that the benefit of the bargain rule "may be modified or supplemented to prevent injustice," *id.*, and determined that in this case, the more appropriate measure was reliance damages. We agree with the judge that an award of benefit of the bargain damages is not appropriate in this case. Our courts have consistently limited the award of benefit of the bargain damages to cases of intentional misrepresentation where the person who was the target of the misrepresentation has actually acquired something in a transaction that is of less value than he was led to believe it was worth when he bargained for it. See, e.g., *Goldman* v. *Mahony*, *supra* at 710 (measure of damages where plaintiffs purchased house misrepresented to have no water problems was value of contractual bargain, i.e., "to have a house worth what the plaintiffs paid for it"); *Rice* v. *Price*, *supra* at 506 (judge did not err in assessing damages based on difference in actual value between heaters that plaintiffs received and heaters they would have received had representations been true). Contrast *Kilgore* v. *Bruce*, 166 Mass. 136, 139 (1896) (finding benefit of bargain damages inappropriate in case where no misrepresentations had been made as to "the character or probable productive power of the things sold"). In cases awarding benefit of the bargain damages, the measure of recovery "closely resembles that for breach of warranty." *Anzalone* v. *Strand*, *supra* at 48 n.2 (citing authorities).

In this case, Finch's misrepresentation did not lead the plaintiffs to purchase something that was worth less than represented. Twin Fires did not acquire anything, nor did it pay for anything it did not want. It "lost" only the opportunity to make a considerable profit on securities it did not own.[26] In such circumstances, the proper measure of recovery is the pecuniary loss actually suffered as a result of the misrepresentation, rather than the "loss" claimed from disappointed expectation. See Restatement (Second) of Torts § 549 (1977). Limiting recovery to reliance damages where the plaintiffs have suffered no loss of value in the subject of the transaction is consistent with the purpose of tort law "to compensate for loss sustained and to restore the plaintiff to his former position, and not to give him the benefit of any contract he has made with the defendant." Restatement of Torts, *supra* at § 549 (2) comment g. See *David* v. *Belmont*, 291 Mass. 450, 453 (1935) ("the rule of damages is one to compensate the party for the loss suffered by the wrong which has been done"). See also *Anzalone* v. *Strand*, *supra* at 48 n.2 (allowing recovery of difference between actual value and promised value on misrepresentation claims serves public policy of preventing "intentionally wrongdoing defendant" from being assured "that his misdeeds will cost him no more than what he receives from his victim").

Morgan Stanley received nothing from the plaintiffs and was not unjustly enriched by any actions Finch's misrepresentations induced the plaintiffs to make. Nor did Finch's misrepresentation affect the value of WEBM shares. Cf. *Piper* v. *Childs*, 290 Mass. 560, 561-562 (1935) (benefit of bargain damages proper where plaintiff purchased shares of stock in reliance on defendant's misrepresentations as to liquidating value). Where the plaintiffs have not lost the benefit of a bargain because of a misrepresentation and a defendant has not gained anything thereby, awarding benefit of the bargain damages would be more than is required "reasonably [to] make the injured party whole"; it would create a "windfall." *Kattar* v. *Demoulas*, 433 Mass. 1, 15 (2000).

---

[26]Twin Fires makes no claim that any of the funds deposited into its account at Morgan Stanley were not returned, or that it lost interest on such funds.

c. *The award of damages under G. L. c. 93A.* The judge concluded that "Finch's fraudulent misrepresentations regarding the likelihood of his obtaining a substantial special allocation of WEBM shares are sufficient alone to support a finding that he and, vicariously, Morgan Stanley engaged in unfair or deceptive acts in trade or commerce." See G. L. c. 93A, § 11.[27] He then determined that the damages he had awarded on the fraudulent misrepresentation claim, $39,650, was the appropriate damage award for the defendants' violation of G. L. c. 93A. Finding that Finch's misrepresentations were wilful and knowing, he trebled that amount for an award of $118,950 to the plaintiffs.[28] Neither defendant disputes that Finch, and vicariously, Morgan Stanley, violated the provisions of G. L. c. 93A, § 2, in misrepresenting to the plaintiffs the prospects of a WEBM special allocation. Nor do the defendants dispute the imposition of treble damages for knowing and wilful violation of G. L. c. 93A. Our conclusion that the judge properly awarded reliance damages rather than benefit of the bargain damages on the misrepresentation claim disposes of the plaintiffs' argument that the judge should have awarded benefit of the bargain damages, trebled, on the G. L. c. 93A claim.

d. *The award of the plaintiffs' attorney's fees.* General Laws c. 93A, § 11, provides that "reasonable attorneys' fees and costs" shall be awarded if a judge finds that a defendant has violated the statute, regardless of the amount in controversy.[29] There is therefore no dispute that Dunne and Twin Fires are

---

[27]In a footnote in their memorandum in opposition to the plaintiffs' petition for attorney's fees, the defendants argued that Twin Fires and Dunne are not "proper" plaintiffs under G. L. c. 93A, § 11. The issue is not raised on appeal and is waived. See *Sullivan* v. *Liberty Mut. Ins. Co., supra.*

[28]The judge stated that he was trebling the award in the interests of justice for three reasons: (1) to compensate more fully the plaintiffs because the amount awarded in reliance damages did not fully compensate them for the injury suffered as a result of Finch's fraudulent misrepresentations; (2) to deter fraudulent misrepresentations in cases involving "hot" IPOs; (3) to "condemn" Morgan Stanley for its "abysmal supervision of Finch and its pathetic failure to communicate its share limit for 'hot' IPOs, [which] permitted this travesty to occur."

[29]General Laws c. 93A, § 11, provides, in part: "If the court finds in any action commenced hereunder, that there has been a violation of [G. L. c. 93A, § 2], the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable at-

entitled to their reasonable attorney's fees and costs. The issue is whether the judge's award of $1 million in attorney's fees and costs was appropriate where the damages he awarded under G. L. c. 93A did not exceed $118,950.

The plaintiffs requested an award of $1,606,185.25 in attorney's fees and $209,646.05 in costs, for a total of approximately $1.8 million. In support of the request they submitted eight affidavits, three of attorneys who had worked on the case and five of attorneys familiar with the reputations of the principal attorneys who had worked on the case; sixty pages of invoices from two law firms and two expert witnesses; and 458 pages of detailed computerized daily time sheets and records of disbursements generated by thirty-seven individual "timekeepers" at the plaintiffs' primary law firm. The hundreds of pages of routine, computerized time sheets were not summarized in any meaningful fashion. Many of the entries, some for only six minutes, do not distinguish whether, for example, the time was expended on unsuccessful claims such as the "blue sky" claim, or expended on claims under G. L. c. 93A. Moreover, the plaintiffs had blackened out references to virtually every detail of the computerized entries, including general subjects of legal research, conferences, and telephone conversations, making it all but impossible for the judge to determine with any reliability which "timekeeper" was working on which aspect of the case at any given moment.[30] In short, the plaintiffs provided the judge with a "data dump."

The plaintiffs' submission fell short, far short, of their obligation to submit sufficient documentation to enable the judge to evaluate the hours spent on particular aspects of the case or the precise nature of the work. Cf. *Yorke Mgt.* v. *Castro*, 406 Mass. 17, 20 (1989) (requirements for prevailing party seeking appellate attorney's fees include "details as to hours spent, precise nature of the work, and fees requested"). See R. Rossi, Attorneys' Fees § 5:2 (3d ed. 2002) ("Insufficiently detailed time records may render it difficult for a court to determine whether particular services are compensable and thus justify the disal-

---

torneys' fees and costs incurred in said action."

[30]For example, one entry reads, "Legal research on [blackened out]," and another reads, "Telephone call with R. Deitz regarding [blackened out]."

lowance of a portion of the compensation requested"). In this case the detail submitted by the plaintiffs was overwhelming, but the substance of the work was elusive.

It was not for the judge, however, to sort out the plaintiffs' perplexing submission. To do so would have been a poor use of judicial resources, as the judge appropriately recognized. In its brief opposition to the plaintiffs' voluminous fee petition, Morgan Stanley did not challenge the hourly rates of the plaintiffs' attorneys, paralegals, or experts, or claim that disbursements were unreasonable.[31] Morgan Stanley did oppose "the way that plaintiffs submitted their time sheets, with no itemization," so that it was "not clear" how much time the plaintiffs devoted to work that had "nothing" to do with their G. L. c. 93A claim. But their opposition to the lack of detail in the fee petition was stated in conclusory terms only.[32]

Instead, the crux of the defendants' opposition was one of proportionality — that a fee request of nearly $2 million on a damage award of $118,950 is disproportionate and excessive, and that the plaintiffs should not have spent so much money in pursuit of their claims under G. L. c. 93A. In short, the defendants submitted a cursory all-or-nothing opposition, based on a theory of proportionality, leaving it to the judge to work his way through the labyrinthian details if he rejected their proportionality argument.

We have said that a judge must examine a number of factors to determine whether an award of attorney's fees and costs is reasonable. See, e.g., *Linthicum* v. *Archambault*, 379 Mass. 381, 388-389 (1979). While the amount of a reasonable attorney's

---

[31]The docket reflects that Morgan Stanley also filed a supplemental brief in opposition to the plaintiffs' petition ten days after the hearing. Its supplemental brief is not contained in the joint record appendix. We therefore do not consider it. See *Commonwealth* v. *Woody*, 429 Mass. 95, 97 (1999) ("On several occasions we have stated that it is the appellant's responsibility to ensure that the record is adequate for appellate review").

[32]The defendants did not, for example, seek an order from the judge requiring the plaintiffs to submit more comprehensible details of the nature of the work performed, nor did they inform the judge that they were unable to challenge the sufficiency or adequacy of the plaintiffs' fee request in light of the incomprehensible data that had been delivered to them. We have every confidence that had they done so, the judge would have awarded appropriate relief.

fee is largely discretionary, a judge "should consider the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation, and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases." *Id.* "No one factor is determinative, and a factor-by-factor analysis, although helpful, is not required." *Berman* v. *Linnane*, 434 Mass. 301, 303 (2001).

Here, the judge expressly stated that he arrived at an award of $1 million in attorney's fees and costs by considering the *Linthicum* factors, and by estimating (as best as he could on the record before him) the reasonable amount of fees and costs the plaintiffs had expended to establish a violation of G. L. c. 93A. He determined that the common-law claims and the claims under G. L. c. 93A were largely predicated on identical facts, and thus that the legal effort to establish the two classes of claims was virtually the same. See *Hanover Ins. Co.* v. *Sutton*, 46 Mass. App. Ct. 153, 177 (1999) (appropriate to award fees where common-law and G. L. c. 93A claims underpinned by "a common core of facts"). He also noted that the case presented "difficult and, at times, novel issues of fact and law." See *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 629 (1978) (judge presiding over action for which plaintiff seeks reasonable attorney's fees generally "has ample opportunity to acquire firsthand knowledge" of factors to be considered in determining size of award).

The defendants claim that the judge "erroneously" based the plaintiffs' fee award "on the amount of damages involved in the litigation ($13 million), rather than on the amount of damages involved in the Chapter 93A claim ($118,950)." Morgan Stanley argues, in effect, that Twin Fires's claim for an award of benefit of the bargain damages of nearly thirteen million dollars under G. L. c. 93A was frivolous, all but negating an award of attorney's fees under the statute. But the judge concluded, correctly in our view, that in light of ambiguity of the case law concerning the appropriate measure of damages for fraudulent misrepresentation in a case such as this, see, e.g., *Goldman* v. *Mahony*, 354 Mass. 705, 710 (1968); *Rice* v. *Price*, 340 Mass.

502, 506 (1960), it was not unreasonable for Twin Fires's attorneys to believe that pursuing a claim for benefit of the bargain damages was a viable strategy. In short, the judge concluded that it was reasonable for the plaintiffs' counsel to have valued the case as having the potential for a multimillion dollar award and to have expended effort in the litigation commensurate with that potential.[33]

The judge did not award the fees that he estimated the plaintiffs incurred in presenting their legal claims of breach of contract or benefit of bargain damages, theories on which the plaintiffs did not prevail. He did not award fees and expenses that he estimated were incurred in establishing the amount of damages for the unsuccessful claims. The judge did not say that he was unable to make a reasonable judgment as to the proportion of time spent on those aspects of the case for which he determined fees should not be awarded because of the nature of the plaintiffs' submission. In light of his firsthand knowledge of the details and complexity of the case, we see no reason to question that judgment. See *Heller* v. *Silverbranch Constr. Corp.*, *supra*. The judge readily acknowledged that he could not realistically review each of the itemized descriptions of the voluminous attorney time records. He was not required to do so. See *Berman* v. *Linnane*, *supra* (judge not "required to review and allow or disallow each individual item in the bill, but could consider the bill as a whole"). It is entirely possible that it is the plaintiffs who have suffered by their failure to provide adequate guidance for the judge. For example, a substantial amount of effort, both pretrial and trial, was obviously expended on developing the facts, for which the judge could appropriately award fees and costs in light of his ruling that the facts required to establish the G. L. c. 93A claims were closely analogous to the facts required to establish the misrepresentation claim. The judge's decision to discount the plaintiffs' submission by almost forty-five per cent (an award of $1 million on a fees claim of more than $1.8 million) is hardly generous to the plaintiffs.

---

[33]There is no basis for the defendants to assert on appeal that the "maximum amount of damages involved" in the G. L. c. 93A claim was $118,950. Because the plaintiffs were pressing for benefit of the bargain damages, they presented at best scant evidence on the issue of reliance damages and did not develop those damages as fully as they might have.

Given the judge's careful attempts to make sense of the unhelpful material before him and the absence of anything beyond a cursory objection from the defendants, we cannot say that he abused his discretion in awarding $1 million in attorney's fees and costs to the plaintiffs. See *id.* at 302-303 ("What constitutes a reasonable fee is a question that is committed to the sound discretion of the judge").

e. *The plaintiffs' request for appellate attorney's fees.* Where a statute provides for the payment of reasonable attorney's fees, an award of attorney's fees on appeal is within the discretion of an appellate court. *Patry* v. *Liberty Mobilehome Sales, Inc.,* 394 Mass. 270, 272 (1985). Here, of course, the statute at issue is G. L. c. 93A, § 11, which provides for an award of reasonable attorney's fees and costs incurred in proving a violation of G. L. c. 93A.

On appeal the plaintiffs request reasonable attorney's fees incurred from the date of their "first fee petition" in the trial court through this appeal. We address the trial and appellate fees separately. First, with respect to the fees incurred in the trial court in connection with the plaintiffs' petition in that court for attorney's fees, we decline to order an award of fees to the plaintiffs, as we shall now explain. In his findings of fact, conclusions of law, and order for judgment dated December 16, 2002, the judge instructed plaintiffs to serve on defense counsel their application for attorney's fees and costs incurred in pursuit of their G. L. c. 93A claim. The plaintiffs did so, and requested $1,606,185.25 in attorney's fees and $209,646.05 in costs incurred through November 30, 2002. They also sought "leave to file a supplemental fee petition" for fees incurred in preparing the petition itself and for "performing other necessary work on this action on or after December 1, 2002." On May 12, 2003, the judge issued his memorandum and order on their fee application. That order did not address the plaintiffs' request to file a supplemental petition, nor did it award any fees incurred after December 1, 2002. The plaintiffs did not file a motion for reconsideration or otherwise ask the judge to permit them to supplement their request to include the preparation for and attendance at the hearing on attorney's fees. Not only did they not bring their claim to the attention of the judge, but their

notice of appeal from the amended judgment made no reference to the judge's failure to address the issue. The issue is waived.

With respect to the fees sought in connection with the appellate proceedings, the plaintiffs' request complied with *Yorke Mgt.* v. *Castro*, 406 Mass. 17, 20 (1989). A prevailing plaintiff may recover for the successful claims of an appeal. See *Bonofiglio* v. *Commercial Union Ins. Co.*, 412 Mass. 612, 613 (1992). The plaintiffs may recover reasonable attorney's fees for their successful defense of their award of attorney's fees and costs under G. L. c. 93A. See *id.* The plaintiffs may apply for such fees under the procedure established by *Fabre* v. *Walton*, 441 Mass. 9, 10-11 (2004).

4. *Conclusion.* For all of these reasons, the judgment is affirmed. The plaintiffs may apply for their appellate attorney's fees in accordance with this opinion.

*So ordered.*