[Cite as *Homestead Am., Ltd. v. Brown*, 2024-Ohio-3253.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Homestead America, Ltd. et al., | : | |
| Plaintiffs-Appellees, | : | No. 23AP-377 |
| | | No. 23AP-382 |
| v. | : | (C.P.C. No. 19CV-9720) |
| Matthew R. Brown et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellants. | : | |
| | : | |

D E C I S I O N

Rendered on August 27, 2024

**On brief:** *Arnold & Clifford LLP, James E. Arnold, Gerhardt A. Gosnell II, Damion M. Clifford*, and *Tiffany L. Carwile*, for Homestead America, Ltd. **Argued:** *Damion M. Clifford.*

**On brief:** *Madison & Rosan LLP, Kristin E. Rosan*, and *Timothy G. Madison*, for Matthew R. Brown and The Wagenbrenner Company. **Argued:** *Kristin E. Rosan.*

**On brief:** *Zeiger, Tigges & Little LLP, Marion H. Little Jr.*, and *Matthew S. Zeiger*, for Michael Wagenbrenner. **Argued:** *Marion H. Little Jr.*

APPEALS from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} Defendants-appellants, Michael Wagenbrenner, Matthew R. Brown, and The Wagenbrenner Company, appeal from judgments of the Franklin County Court of Common Pleas denying appellants' motions for directed verdict, entering judgment in favor of plaintiffs-appellees, Homestead America Ltd. ("Homestead") and David Anderson, and

denying appellants' motions for directed verdict and judgment notwithstanding the verdict ("JNOV"). For the reasons that follow, we reverse and remand the case for proceedings consistent with this decision.

## I. Facts and Procedural History

{¶ 2} On December 5, 2019, Homestead, Mr. Anderson, Winchester Oaks LLC ("Winchester Oaks"), and Brian Barker filed a complaint against appellants asserting claims for breach of fiduciary duty and fraud. The allegations in the complaint concerned events that transpired in 2015, when Homestead submitted an offer to purchase several multi-family residential buildings located near the intersection of Star Ave. and King Ave. in Grandview, Ohio (the "Star King Portfolio").

{¶ 3} On April 14, 2015, Mark Crosby and Michael Kirch (the "sellers") executed an agreement granting The Wagenbrenner Company the exclusive right to sell the Star King Portfolio. Mr. Wagenbrenner was the broker of record for The Wagenbrenner Company in 2015. Mr. Brown was a licensed real estate agent employed by The Wagenbrenner Company at that time and the listing agent for the Star King Portfolio. Mr. Kirch explained that "price was the major factor" in the sellers' decision to sell the Star King Portfolio, and that the sellers expected Mr. Brown to get the "highest and best price possible" for the property. (Oct. 10, 2022 Tr. Vol. 6 at 1072, 1153.)

{¶ 4} Mr. Anderson was the managing member of Homestead, an entity that owns and manages several multi-family and student housing properties in Ohio, Arizona, and Texas. On May 18, 2015, Mr. Brown contacted Mr. Anderson and informed him of the Star King Portfolio listing. Mr. Anderson told Mr. Brown he was "absolutely" interested in the property and that the "timing couldn't be better." (Oct. 4, 2022 Tr. Vol. 2 at 346, 349.) In 2015, Mr. Anderson and Mr. Barker were in the process of selling a multi-family property they owned and wanted to use the proceeds from the sale to purchase another property. Mr. Anderson stated that, when he spoke with Mr. Brown on May 18, 2015, he asked Mr. Brown if "Mike Wagenbrenner [was] buying this deal" and Mr. Brown "said no. * * * Mike Wagenbrenner's not going to buy the property." (Tr. Vol. 2 at 348-49.) Mr. Anderson also stated that he asked Mr. Brown to be his broker on May 18, 2015, and that Mr. Brown said "[y]es, he would." (Tr. Vol. 2 at 346-47.) Mr. Brown informed Mr. Anderson that offers for the Star King Portfolio were due by 5:00 p.m. on July 10, 2015.

{¶ 5} Following their initial conversation, Mr. Brown emailed Mr. Anderson a confidentiality agreement for the Star King Portfolio. Mr. Anderson executed the confidentiality agreement and returned it to Mr. Brown. The confidentiality agreement stated that Mr. Anderson had "requested information * * * for the purpose of evaluating a possible acquisition of the Property" and that Mr. Anderson agreed not to "disclose, permit the disclosure of, release, disseminate or transfer, any information hereunder * * * to any other person or entity." (Dec. 5, 2019 Compl., Ex. A, Confidentiality Agreement at 1.) The agreement also stated that Mr. Anderson "intend[ed] to utilize the services of Matthew Brown & The Wagenbrenner Company with the understanding that The Wagenbrenner Company Real Estate Investment Brokerage Company is representing the Seller." (*Id.*)

{¶ 6} On May 18, 2015, Mr. Brown emailed Michael Wagenbrenner and Jeff Wagenbrenner the marketing brochure for the Star King Portfolio. Michael Wagenbrenner responded to Mr. Brown's email stating, "That's an impressive brochure. What do you think it will take to buy it and will it make financial sense?" (Pl.'s Trial Ex. 5.) Mr. Brown responded stating that it would cost "[p]robably north of $12.5 [million]" to purchase the property. (Pl.'s Trial Ex. 5; Oct. 5, 2022 Tr. Vol. 3 at 626.) In response, Michael Wagenbrenner noted that it would "be nice to add that to our portfolio, but we would have to put about $2.5 mil[lion] down which we don't have." (Pl.'s Trial Ex. 5.)

{¶ 7} By July 1, 2015, a group comprised of Jeff Wagenbrenner, Michael Wagenbrenner, Sam Powers, Dave Powers, and Chris Paul (the "purchasing group") "were discussing purchasing the [Star King] portfolio." (Tr. Vol. 3 at 563.) On July 6, 2015, Jeff Wagenbrenner sent an email to Matthew Brown and the members of the purchasing group discussing different financing scenarios for the group's purchase of the Star King Portfolio.

{¶ 8} On July 8, 2015, Mr. Anderson learned from his uncle that Michael Wagenbrenner was "buying a new property in Grandview." (Tr. Vol. 2 at 365.) That day, Mr. Anderson called Mr. Brown and asked whether Michael Wagenbrenner intended to purchase the Star King Portfolio. In response, Mr. Brown stated, "No. I already told you he's not buying the portfolio." (Tr. Vol. 2 at 366.) Mr. Anderson claimed that, if he had known Michael Wagenbrenner was interested in purchasing the property on July 8, 2015, he would have found "[his] own broker, to advocate [Homestead] for the deal" and would have submitted a "sealed bid." (Tr. Vol. 2 at 380.)

{¶ 9}   Prior to the 5:00 p.m. deadline on July 10, 2015, Mr. Anderson called Mr. Brown and asked where Homestead "need[ed] to be" in order to "be the outlier." (Tr. Vol. 2 at 367.)  Mr. Brown told Mr. Anderson the sellers would "only sell if it's [$]12" million, and that "[n]one of [his] buyers [were] up to a 12." (Tr. Vol. 2 at 367.)  On July 10, 2015, just before 5:00 p.m., Homestead submitted a letter of intent offering to purchase the Star King Portfolio for $12.275 million.

{¶ 10} On July 11, 2015, Mr. Brown drafted a letter of intent for the purchasing group, offering to purchase the Star King Portfolio for $12.3 million.  The purchasing group submitted their letter of intent for the property on July 11, 2015.  The sellers countered the purchasing group's offer requesting $12.5 million, and the purchasing group accepted the sellers' $12.5 million counteroffer.  On July 20, 2015, Mr. Brown informed Homestead and the other prospective purchasers that the sellers had not accepted their offers.

{¶ 11} On July 24, 2015, Mr. Anderson asked Mr. Brown to inform the sellers that Homestead would increase its offer for the Star King Portfolio to $12.625 million.  Mr. Brown informed the sellers of Homestead's increased offer on July 30, 2015.  Mr. Kirch explained that, because the sellers felt they had a "handshake deal" with the purchasing group, and because Homestead's increased offer was only $125,000 more than the agreed upon $12.5 million selling price, the sellers decided to "go ahead in good faith and forego the 100,000, or whatever it was, and close" with the purchasing group.  (Tr. Vol. 6 at 1154, 1094.)  On August 5, 2015, Mr. Brown informed Mr. Anderson that the sellers had rejected Homestead's increased offer.  The sale of the Star King Portfolio to the purchasing group closed on December 15, 2015.

{¶ 12} In their complaint, plaintiffs presented claims asserting: (1) Mr. Brown breached fiduciary duties he owed to plaintiffs as their real estate agent; (2) Mr. Brown committed fraud on July 8, 2015 when he told Mr. Anderson that Mr. Wagenbrenner was not interested in purchasing the property; and (3) Mr. Brown committed fraud on July 10, 2015 when he told plaintiffs the other offers for the Star King Portfolio were less than $12 million.  Plaintiffs alleged that The Wagenbrenner Company and Mr. Wagenbrenner were vicariously liable for the acts and omissions of Mr. Brown.

{¶ 13} On February 11, 2022, appellants filed Civ.R. 56(C) motions for summary judgment.  The trial court granted in part and denied in part appellants' motions for

summary judgment. The court granted appellants summary judgment on all claims asserted by Winchester Oaks and Mr. Barker, and granted appellants summary judgment on plaintiffs' fraud claim pertaining to Mr. Brown's July 10, 2015 statements. The trial court found genuine issues of material fact pertaining to Homestead's and Mr. Anderson's remaining claims.

{¶ 14} On April 13, 2022, Mr. Wagenbrenner filed a motion in limine to preclude plaintiffs from offering evidence at trial of damages in excess of their out-of-pocket losses. Mr. Wagenbrenner asserted that, because Mr. Brown's allegedly fraudulent statements did not result in a contract for plaintiffs to purchase the Star King Portfolio, plaintiffs could not recover benefit-of-the-bargain damages. Mr. Wagenbrenner relied on the Restatement of the Law 2d, Torts, § 549 (1977) ("Restatement § 549"), *Auto Chem Laboratories, Inc. v. Turtle Wax Inc.*, S.D.Ohio No. 3:07cv156, 2010 U.S. Dist. LEXIS 100677 (Sept. 24, 2010), *Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266 (7th Cir.1996), and *LHC Nashua Partnership, Ltd. v. PDNED Sagamore Nashua, LLC*, 659 F.3d 450 (5th Cir.2011) to support his argument. Mr. Brown and The Wagenbrenner Company joined Mr. Wagenbrenner's motion in limine.

{¶ 15} Plaintiffs responded to Mr. Wagenbrenner's motion in limine on April 27, 2022, asserting they were entitled to receive benefit-of-the-bargain damages because they "entered into a transaction with Brown" when they "asked Brown to be their real estate agent and Brown accepted." (Memo in Opp. to Mot. in Lim. at 5-6.) Plaintiffs asserted that, pursuant to *Northpoint Properties v. Charter One Bank*, 8th Dist. No. 94020, 2011-Ohio-2512, they could receive benefit-of-the-bargain damages so long as they presented " 'competent evidence of damages * * * to establish with reasonable certainty an amount sufficient to fully and fairly compensate the aggrieved party.' " (Memo in Opp. to Mot. in Lim. at 6, quoting *Northpoint Properties* at ¶ 36.)

{¶ 16} On October 3, 2022, a ten-day jury trial commenced. Prior to the presentation of evidence, the trial court denied Mr. Wagenbrenner's motion in limine. (Oct. 3, 2022 Tr. Vol. 1 at 78.) At trial, appellants objected when plaintiffs presented evidence pertaining to their benefit-of-the-bargain damages. The trial court overruled the objections. (Tr. Vol. 3 at 610-12; Oct. 6, 2022 Tr. Vol. 4 at 775-76.) Plaintiffs presented evidence addressing the acquisition fee they would have earned from purchasing the Star

King Portfolio, the profits they would have made from operating and managing the Star King Portfolio, and the proceeds they would have made from selling the Star King Portfolio in July 2020. Plaintiffs claimed their benefit-of-the-bargain damages totaled $7,081,478.

{¶ 17} Appellants moved for a directed verdict at the conclusion of the plaintiffs' case-in-chief and at the conclusion of all the evidence. (Tr. Vol. 6 at 1209; Oct. 12, 2022 Tr. Vol. 8 at 1711.) Appellants argued plaintiffs failed to establish the injury element of their fraud claim, because plaintiffs failed to present any evidence regarding their out-of-pocket losses. The trial court denied appellants' motions for directed verdict.

{¶ 18} On October 14, 2022, the jury returned a verdict in favor of plaintiffs on their fraud claim and a verdict in favor of appellants on plaintiffs' breach of fiduciary duty claim. The jury awarded plaintiffs $3,540,739 in compensatory damages and found The Wagenbrenner Company vicariously liable for the fraud committed by Mr. Brown. The jury determined that punitive damages were not warranted in the case. On October 26, 2022, the trial court issued a judgment entry enforcing the jury verdict.

{¶ 19} On November 22, 2022, appellants filed motions for JNOV, asserting that plaintiffs were limited to recovering out-of-pocket damages because the alleged fraud did not result in a contract for plaintiffs to purchase the Star King Portfolio. Because plaintiffs failed to present any evidence to establish their out-of-pocket damages at trial, appellants argued that plaintiffs failed to establish their claim for fraud. Plaintiffs filed a combined memorandum in opposition to appellants' motions for JNOV, asserting fraud damages could "include both out-of-pocket expenses and/or expectancy-type damages so long as there is competent evidence of any such damages with reasonable certainty." (Dec. 13, 2022 Memo in Opp. at 1.)

{¶ 20} On May 30, 2023, the trial court issued a decision and entry denying appellants' motions for JNOV. The court found that while "Ohio courts ha[d] followed Restatement (Second) Torts § 549," there was "no evidence provided that Ohio ha[d] adopted Restatement (Second) Torts § 549." (JNOV Decision and Entry at 5.) As such, the court concluded that the jury properly "applied Ohio law" and awarded plaintiffs benefit-of-the-bargain damages. (JNOV Decision and Entry at 5.)

## II. Assignments of Error

{¶ 21} Mr. Brown and The Wagenbrenner Company appeal, assigning the following errors for our review:

> **1. The Trial Court Erred in Denying Appellant Brown and Wagenbrenner Co.'s Motion for Directed Verdict and Motion for Judg[]ment Notwithstanding the Verdict Because Appellee is Only Entitled to Out-of-Pocket Damages.**
>
> **2. The Trial Court Erred in Denying Appellant Brown and Wagenbrenner Co.'s Motion for Directed Verdict and Motion for Judg[]ment Notwithstanding the Verdict Because Appellee Homestead's Damages are Speculative.**
>
> **3. The Trial Court Erred in Denying Appellant Brown and Wagenbrenner Co.'s Motion for Directed Verdict and Motion for Judg[]ment Notwithstanding the Verdict Because in Appellee's Fraud Claim Appellee Did Not Demonstrate Justifiable Reliance.**
>
> **4. The Trial Court Erred in Denying Appellant Brown and Wagenbrenner Co.'s Motion for Directed Verdict and Motion for Judg[]ment Notwithstanding the Verdict Because in Appellee's Fraud Claim Appellee Did Not Demonstrate Appellant Brown and Wagenbrenner Co. Proximately Caused Appellee's Damages.**
>
> **5. The Trial Court Erred by Providing the Jury with Incorrect Instructions.**

{¶ 22} Mr. Wagenbrenner also appeals, assigning the following errors for our review:

> **Assignment of Error No. 1:** The trial court committed reversible error by allowing Homestead America, Ltd. ("Homestead") to offer evidence of expectancy damages at trial.
>
> **Assignment of Error No. 2:** The trial court committed reversible error by allowing Homestead to offer evidence at trial of expectancy damages occurring after the date of the fraudulent statements.

**Assignment of Error No. 3:** The trial court erred in admitting the testimony of any expert witness who relied upon hearsay statements and other materials and assumptions not contained in the record in violation of Evidence Rule 703.

**Assignment of Error No. 4:** The trial court erred in admitting expectancy damages based upon assumptions, speculation, and/or hearsay.

**Assignment of Error No. 5:** The trial court erred in denying Defendant's motion for a directed verdict.

**Assignment of Error No. 6:** The trial court erred in not entering judgment for Defendants given Homestead's failure to offer any evidence of out-of-pocket damages.

**Assignment of Error No. 7:** The trial court erred in not entering judgment for Defendants given Homestead's lack of reasonable reliance.

**Assignment of Error No. 8:** The trial court erred by rejecting Wagenbrenner's Proposed Jury Instruction No. 31 to instruct the jury on written disclaimers.

**Assignment of Error No. 9:** The trial court committed reversible error in failing to instruct the jury on the proper measure of damages.

**Assignment of Error No. 10:** The trial court erred in rejecting Wagenbrenner's Proposed Jury Instruction No. 35 and No. 36 of Wagenbrenner's First Amended Jury Instructions to instruct the jury on out-of-pocket damages being the proper measure of damages.

**Assignment of Error No. 11:** The trial court erred in denying Defendants' Motion for Judgment Notwithstanding the Verdict And, Alternatively, A New Trial.

III.  **Mr. Brown's and The Wagenbrenner Company's First Assignment of Error and Mr. Wagenbrenner's Fifth, Sixth, and Eleventh Assignments of Error: Directed Verdict and Judgment Notwithstanding the Verdict**

{¶ 23} Mr. Brown's and The Wagenbrenner Company's first assignment of error and Mr. Wagenbrenner's fifth, sixth, and eleventh assignments of error assert the trial court

erred by denying their respective motions for directed verdict and for JNOV. "The standard for granting a motion for judgment notwithstanding the verdict * * * pursuant to Civ. R. 50(B) is the same as that for granting a motion for a directed verdict pursuant to Civ. R. 50(A)." *Texler v. D.O. Summers Cleaners & Shirt Laundry, Co.*, 81 Ohio St.3d 677, 679 (1998), citing *Wagner v. Roche Laboratories*, 77 Ohio St.3d 116, 121 (1996), fn. 2.

{¶ 24} Civ.R. 50(A)(4) directs a trial court to grant a motion for directed verdict if, after construing the evidence most strongly in favor of the party against whom the motion is directed, the court "finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." "The 'reasonable minds' test mandated by Civ.R. 50(A)(4) requires the court to discern only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party." *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, ¶ 3.

{¶ 25} Civ.R. 50(B)(1) governs motions for JNOV, providing that "a party may serve a motion to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion." "When ruling on a motion for judgment notwithstanding the verdict, a trial court applies the same test as in reviewing a motion for a directed verdict," and determines "whether the evidence is totally insufficient to support the verdict." *Harper v. Lefkowitz*, 10th Dist. No. 09AP-1090, 2010-Ohio-6527, ¶ 8.

{¶ 26} Although the analysis for both motions " 'requires a court to review and consider the evidence, motions for directed verdict and judgment notwithstanding the verdict present a question of law because a court must examine the sufficiency of the evidence, not weigh the evidence or try the credibility of the witnesses.' " *Hale v. Spitzer Dodge, Inc.*, 10th Dist. No. 04AP-1379, 2006-Ohio-3309, ¶ 15, quoting *Miller v. Lindsay-Green, Inc.*, 10th Dist. No. 04AP-848, 2005-Ohio-6366, ¶ 52. *Accord Goodyear Tire & Rubber Co.* at ¶ 4, quoting *O'Day v. Webb*, 29 Ohio St.2d 215 (1972), paragraph three of the syllabus (stating that a " 'motion for directed verdict * * * does not present factual issues, but a question of law, even though in deciding such a motion, it is necessary to review and consider the evidence' "). *See also Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 25 (stating that, "[f]aced with the question of sufficiency through a directed verdict

motion, the court must determine whether any evidence exists on every element of each claim or defense for which the party has the burden to go forward"). Appellate review of both motions for directed verdict and motions for JNOV is de novo. *Hale* at ¶ 15.

{¶ 27} The tort of fraud consists of six elements: (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. *San v. Scherer*, 10th Dist. No. 97APE03-317, 1998 Ohio App. LEXIS 405, * 18 (Feb. 5, 1998), citing *Burr v. Bd. of Cty. Commrs.*, 23 Ohio St.3d 69 (1986), paragraph two of the syllabus, *superseded by statute on other grounds. Accord Tokles & Son v. Midwestern Indem. Co.*, 65 Ohio St.3d 621, 632 (1992). Appellants contend they were entitled to a directed verdict and/or JNOV on plaintiffs' fraud claim because plaintiffs failed to establish any injury resulting from their reliance on Mr. Brown's July 8, 2015 representation. Appellants assert that expectancy or benefit-of-the-bargain-type damages were legally unavailable to plaintiffs because plaintiffs never had a contract to purchase the Star King Portfolio. Appellants further assert that, while plaintiffs could have recovered their out-of-pocket losses resulting from Mr. Brown's misrepresentation, plaintiffs failed to present any evidence to establish their out-of-pocket damages.

{¶ 28} It "has long been the rule in our state that '[a] person injured by fraud is entitled to such damages as will fairly compensate him for the wrong suffered; that is, the damages sustained by reason of the fraud or deceit, and which have naturally and proximately resulted therefrom.' " *Burr* at 74, quoting *Foust v. Valleybrook Realty Co.*, 4 Ohio App.3d 164, 166 (6th Dist.1981). *Accord Shover v. Cordis Corp.*, 61 Ohio St.3d 213, 217 (1991), *overruled on other grounds*; *Brewer v. Brothers*, 82 Ohio App.3d 148, 154 (12th Dist.1992) (stating the "person injured by fraud is entitled to recover damages naturally and proximately resulting from the fraud").

{¶ 29} In *Molnar v. Beriswell*, 122 Ohio St. 348 (1930) the Supreme Court of Ohio held that, where a sale of property is procured "by a vendor's fraudulent representation," the proper measure of damages is "the difference between the actual value of the property

at the time of the purchase and its value had it been as represented." *Id.* at paragraph one of the syllabus. This measure of damages is known as the "benefit of the bargain" rule. *Brewer* at 154, citing *Molnar* at paragraph one of the syllabus. *Accord Dziedzicki v. Bonafine*, 9th Dist. No. 15597, 1992 Ohio App. LEXIS 6393, *6 (Dec. 16, 1992); *Mazzurco v. Aeon Fin., L.L.C.*, 8th Dist. No. 103537, 2016-Ohio-3324, ¶ 10-11. *See also Alternatives Unlimited-Special, Inc. v. Ohio Dept. of Edn.*, 10th Dist. No. 12AP-647, 2013-Ohio-3890, ¶ 29, citing Restatement of the Law 2d, Contracts, Section 344(a) (1981) (explaining that damages that place the non-breaching party to a contract "in the position it would have been had the contract been fully performed" protect the party's "expectation interest, i.e., its interest in having the benefit of the bargain"). In *Molnar*, the purchaser of an apartment building relied on the seller's misrepresentation that the building was fully rented, when it was in fact only partially rented. The court held that, in their fraud action against the seller, the purchaser was entitled to receive the difference between the actual value of the apartment building as partially rented and the value of the apartment building if it had been fully rented. *Molnar* at paragraph two of the syllabus.

{¶ 30} When a vendor's fraudulent misrepresentations induce the sale of property, courts of this state have also held that the buyer may choose between benefit-of-the-bargain damages and out-of-pocket damages in their fraud action against the vendor. For instance, in *Brewer*, the buyer purchased property relying on the seller's fraudulent misrepresentation regarding the property's electrical system. The buyer filed an action for fraud against the seller and presented evidence at trial of the cost he incurred to repair the property's electrical system. The reviewing court held that, while benefit-of-the-bargain damages were appropriate "[w]here there is fraud inducing the purchase or exchange of real estate," courts had "also held that the cost of repair or replacement is a fair representation of damages." *Id.* at 154. As such, the *Brewer* court held that the "repair or replacement cost [was] an adequate measure of damages, particularly given that the goal is to compensate the owner for the loss sustained" by the fraud. *Id. Accord Dziedzicki* at *7.

{¶ 31} In *Northpoint Properties*, 2011-Ohio-2512, the court also held that a purchaser's cost to repair property can be an appropriate measure of damages. The purchaser in *Northpoint Properties* relied on the seller's misrepresentations regarding a commercial office building's fire-suppression system when purchasing the property, and

the purchaser sued the seller for fraud. The purchaser presented evidence at trial demonstrating the cost incurred to repair the building's fire-suppression system. The trial court concluded the purchaser failed to establish an injury resulting from the seller's fraud because the purchaser failed to present evidence of its benefit-of-the-bargain damages pursuant to *Molnar*.

**{¶ 32}** On appeal, the *Northpoint Properties* court considered Restatement § 549 and determined that "the benefit-of-the-bargain rule may be an appropriate measure of damages when this measure can be established by proof in accordance with the usual rules of certainty in damages." *Id.* at ¶ 35, citing Restatement § 549, Comments g and h. However, the court noted that, " '[i]n order to give the plaintiff the benefit of the bargain, it is not necessary in all cases to give him the value of the thing as represented. He may be fully and fairly compensated if he is given the cost of making it as represented.' " *Id.* at ¶ 35, quoting Restatement § 549 Comment l. As such, the *Northpoint Properties* court concluded the "appropriate inquiry [was] whether competent evidence of damages has been presented to establish with reasonable certainty an amount sufficient to fully and fairly compensate the aggrieved party." *Id.* at ¶ 36. Because the purchaser presented competent evidence of its cost to repair the building's fire-suppression system, the court held the purchaser was entitled to receive the "reasonable cost to repair" the property as damages resulting from the sellers' fraud. *Id.* at ¶ 37.

**{¶ 33}** Plaintiffs contend that *Brewer* and *Northpoint Properties* demonstrate the "proper measure of damages for fraud may include both benefit-of-the-bargain and/or out-of-pocket expenses, depending on which measure of damage will adequately compensate the plaintiff for the fraud and prevent the defrauding party from escaping liability." (Appellee's Brief at 25.) Unlike the present case, however, the plaintiffs in both *Brewer* and *Northpoint Properties* purchased property relying on a seller's misrepresentation, and the reviewing court held that the plaintiff could recover either benefit-of-the-bargain damages or their reasonable costs to repair the property. Neither *Brewer* nor *Northpoint Properties* address a situation similar to the one presented here, where the plaintiff never purchased the property and never had a contractual agreement with the seller.

**{¶ 34}** In *Burke v. Gene Hoffman Dev. Corp.*, 8th Dist. No. 35192, 1977 Ohio App. LEXIS 8099 (Apr. 14, 1977), the court addressed a situation where the plaintiff sued a

defendant for fraud and sought lost profits from the plaintiff's contract with a third party as damages.   In *Burke*, the Gene Hoffman Development Corporation ("Hoffman") contracted with the J.H. Burke Company ("Burke") for Burke to remodel a building. Hoffman agreed to pay Burke his costs and an extra ten percent of his costs monthly. Unbeknownst to Burke, Hoffman was using proceeds from loans he obtained from a bank to pay Burke's bills.   The manager of the bank, Timothy Wayne, approved the loans to Hoffman, but Wayne did not have authority to approve the loans.   When Hoffman failed to pay one of Burke's monthly bills, Burke had a meeting with Hoffman and Wayne.   Burke asked Wayne whether there was a commitment from the bank for the remodeling project. Wayne responded that there was a commitment of about $800,000 and Burke would receive payment in a few days.   Burke relied on Wayne's representations and continued to work on the remodeling project.   Thereafter, Hoffman again failed to pay Burke and Burke sued the bank for fraud based on Wayne's misrepresentations regarding the loan.   The jury awarded Burke both his out-of-pocket losses and his lost profits from his contract with Hoffman as damages.

{¶ 35} The reviewing court noted that, generally, "damages for fraud are determined under the 'benefit of the bargain rule,' whereby the plaintiff is entitled to lost profits resulting from the fraud."  *Id.* at *16, quoting Restatement (Second) of Torts § 549 (Tent. Draft No. 11 April 15, 1965).   However, the court found "persuasive authority for the proposition that where the fraudulent representations of the defendant induce the plaintiff to engage in a transaction with a third party, the damages should be determined not according to the 'benefit-of-the-bargain rule', but should be determined based on the out-of-pocket losses resulting from the fraud."  *Id.* at *17, citing *Sorenson v. Gardner*, 215 Ore. 255 (1959).   Thus, because Wayne's fraudulent misrepresentation induced Burke to continue performing pursuant to his contract with a third party, the court of appeals held that "Burke's recovery against the bank should have been limited to his out-of-pocket losses."  *Id.* at *17.  *See Sorenson* at 266 (holding the plaintiff/purchaser was limited to recovering out-of-pocket losses in their action against the defendant for fraud, where the defendant's misrepresentations induced the plaintiff to purchase property from a third party because "there [was] no warranty and no advantage which would inure to the

wrongdoer, because there [was] no contract between the purchaser and the maker of the representations").

{¶ 36} Plaintiffs assert *Burke* is not applicable to the present case because Mr. Brown's "fraud *prevented* the consummation of a transaction by the plaintiff," whereas Wayne's fraud in *Burke* "*induce*[d] the plaintiff to engage in a transaction with a third party." (Emphasis sic.)  (Appellee's Brief at 30, 32.)  However, whether the defendant's fraudulent misrepresentations induced or prevented the plaintiff's contract with a third party, in both scenarios the plaintiff lacks a contractual agreement with the defendant who engaged in fraud.

{¶ 37} Plaintiffs further assert that Ohio has not "adopted" Restatement § 549 "as a reflection of Ohio law for purposes of determining fraud damages." (Appellee's Brief at 30.)  While no Ohio court has expressly adopted Restatement § 549, Ohio courts have relied on Restatement § 549 when assessing the appropriate measure of damages for fraud.   In *Northpoint Properties*, the court observed that " 'Ohio courts have generally followed, whether specifically noted or not, the principles set forth in the Restatement (Second) of Torts when discerning the propriety and amount of damages in fraud cases.' " *Northpoint Properties*, 2011-Ohio-2512 at ¶ 32, quoting *Auto Chem Laboratories, Inc.*, 2010 U.S. Dist. LEXIS 100677 at *22.  *See also Burke* (relying on a 1965 tent. draft of Restatement § 549); *DeFilippo v. Szabo*, 9th Dist. No. 918, 1980 Ohio App. LEXIS 14262, *3-4 (May 14, 1980) (relying on Restatement § 549); *MADFAN, Inc. v. Makris*, 8th Dist. No. 103655, 2017-Ohio-979, ¶ 8 (relying on Restatement § 549).  As such, we find Restatement § 549 instructive regarding the proper measure of damages for fraud.

{¶ 38} Restatement § 549 provides as follows:

> (1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including
>
> (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
>
> (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.

(2) The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

{¶ 39} In *Northpoint Properties*, the court explained that "[d]amages awarded under subsection (1) [of Restatement § 549] are known as 'out-of-pocket' damages, while those awarded under subsection (2) are 'benefit-of-the-bargain damages.' " *Northpoint Properties* at ¶ 33, citing *Auto Chem Laboratories, Inc.* The comments to Restatement § 549 explain that the out-of-pocket losses described in subsection (1) are the "rules normally applicable to determine the measure of damages recoverable for a fraudulent misrepresentation" because "the purpose of a tort action is to compensate for loss sustained and to restore the plaintiff to his former position, and not to give him the benefit of any contract he has made with the defendant." Restatement § 549 at Comment g. Indeed, " '[r]ecovery in tort seeks to restore the plaintiff to where he was before the defendant's wrongful conduct injured him, whereas contract law seeks to put the plaintiff where he would be had the defendant properly performed his duty under the contract.' " *Motorists Mut. Ins. Co. v. Ironics, Inc.*, 168 Ohio St.3d 467, 2022-Ohio-841, ¶ 27, quoting *Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 239 (6th Cir.1994).

{¶ 40} The comments to Restatement § 549 further explain that, "[w]hen the plaintiff has not entered into any transaction with the defendant but has suffered his pecuniary loss through reliance upon the misrepresentation in dealing with a third person, [the rules stated in subsection (1)] must of necessity be applied." Restatement § 549 at Comment g. Accordingly, when the plaintiff has not entered into a transaction with the defendant and suffers loss in dealing with a third party, the plaintiff is limited to recovering out-of-pocket losses. *Accord Sorenson*; *Burke*. When the plaintiff has a contract with the defendant, however, subsection (2) of Restatement § 549 provides that the plaintiff is entitled to recover damages "sufficient to give him the benefit of his contract with the maker." The comments to Restatement § 549 explain that, while many jurisdictions have adopted the benefit-of-the-bargain rule as the sole measure of damages for fraud, Restatement § 549(2) "does not take this position." Restatement § 549 at Comment g. Instead, Restatement § 549 follows the "compromise position adopted by some

jurisdictions, giving the plaintiff the option of either the out-of-pocket or the benefit-of-the-bargain rule in any case in which the latter measure can be established by proof in accordance with the usual rules of certainty in damages." *Id.* at Comment h. *Accord Brewer*; *Northpoint Properties*.

{¶ 41} Plaintiffs contend that Restatement § 549 gives them the option to recover either out-of-pocket or benefit-of-the-bargain damages in the present case. (Appellee's Brief at 26-27.) We disagree. The comments to Restatement § 549 plainly provide that "[w]hen the plaintiff has not entered into any transaction with the defendant," the plaintiff is limited to recovering out-of-pocket losses. *Id.* at Comment g. Thus, when the plaintiff has entered into a contract with the defendant, Restatement § 549 provides the plaintiff with the option to pursue either out-of-pocket or benefit-of-the-bargain damages. When the plaintiff has not entered into a contract with the defendant, however, they do not have the option to recover benefit-of-the-bargain damages.

{¶ 42} A majority of courts have applied the principles expressed in Restatement § 549. In *Auto Chem Laboratories, Inc.* a federal district court relied on Restatement § 549 to hold that, if the plaintiffs established the defendant was "liable to them for fraud, based on a valid contract that existed between the parties, [plaintiffs were] entitled to benefit-of-the bargain damages." 2010 U.S. Dist. LEXIS 100677 at *27. The court further explained that, if the plaintiffs established the defendant was "liable to them for fraud, but not based on a valid contract, however, they are only entitled to the pecuniary loss of which the fraudulent conduct was a legal cause." *Id.* The *Auto Chem Laboratories, Inc.* court noted that, while the "Ohio Supreme Court has not ruled on this particular issue," the court in *Burke* "used the 'out-of-pocket' expense approach in a situation not involving a contractual relationship between the parties, as have courts in other jurisdictions." *Id.* at *27, fn. 7. *See Maranda v. Stanfill*, N.D.Ohio No. 5:22-cv-02015, 2023 U.S. Dist. LEXIS 153797, *3-4 (Aug. 31, 2023), (following *Auto Chem Laboratories, Inc.*); *IPFS Corp. v. Continental Cas. Co.*, W.D.Mo. No. 4:11-CV-00256-BCW, 2013 U.S. Dist. LEXIS 191451, *84-85 (Aug. 15, 2013) (stating that "the benefit of the bargain rule [was] not applicable as a measure of damages" in the plaintiff's fraud action because the plaintiff did not have a contract with the defendant); *Edward J. DeBartolo Corp. v. Coopers & Lybrand*, 928 F.Supp. 557, 566 (W.D.Pa.1996) (noting that the "rationale for limiting benefit of the bargain damages to the

situation where the plaintiff has made a bargain with the defendant applies equally to federal securities laws claims as it does to common law tort claims").

{¶ 43} In *Roboserve, Inc.,* 78 F.3d 266, Roboserve entered into a five-year contract with the Hyatt Corporation ("Hyatt") for Roboserve to install 1,000 of its minibars in rooms at the Hyatt Regency Chicago ("HRC"). Kato Kagaku Co., Ltd. ("Kato") owned the HRC and employed Hyatt to manage the HRC. After contracting with Roboserve, Hyatt also contracted with another company, ServiBar, to install its minibars in other rooms at the HRC. Hyatt "explained this as a test 'to evaluate the two Honor Bar systems' " and Hyatt told Roboserve that the "winner of the test would become the preferred minibar provider for Hyatt hotels." *Id.* at 271. However, the evidence demonstrated that the "test" was a pretext, as Hyatt had already signed a seven-year contract with ServiBar when it announced the test to Roboserve. *Id.* at 271. Roboserve sued Kato for breach of contract and fraud. Roboserve's fraud claim asserted Kato's agent, Hyatt, "defrauded Roboserve of further Hyatt business." *Id.* at 272. The jury awarded Roboserve $1 million in benefit-of-the-bargain damages on its fraud claim.

{¶ 44} The reviewing court noted that Illinois, whose law the court was applying, had formally adopted Restatement § 549. As such, the court held that "benefit-of-the-bargain damages [were] limited to 'situations where the transaction between the parties ha[d] actually been consum[m]ated based on the fraudulent misrepresentation.' " *Id.* at 274, quoting *Gold v. Dubish*, 193 Ill.App.3d 339, 352 (1989). The court noted that benefit-of-the-bargain damages "[were] clearly not appropriate * * * in the absence of an actual, binding agreement," because damages for fraud "are not intended to restore what one never had." *Id.* at 274. Accordingly, because Hyatt's "alleged fraud did not induce any contract," the court held that Roboserve was limited to recovering its out-of-pocket losses. *Id.* at 274. *See also Elliott v. Aspen Brokers*, 811 F.Supp. 586, 591 (D.Colo.1993) (holding that, because the plaintiff "was not induced by the fraudulent misrepresentations to consummate the transaction," the plaintiff could not "recover benefit-of-the-bargain damages in this lawsuit, only her out-of-pocket expenses").

{¶ 45} In *LHC Nashua Partnership, Ltd.*, 659 F.3d 450, the court also relied on Restatement § 549 to limit the plaintiff to out-of-pocket losses. In *LHC Nashua Partnership, Ltd.*, the plaintiff and defendant entered into a Purchase and Sale Agreement

("P&S Agreement") for the plaintiff to purchase the defendant's option to purchase a shopping mall. The defendant also had an agreement with Lowe's Home Improvement ("Lowe's") that gave Lowe's a right of first refusal to purchase the mall. The defendant informed the plaintiff that Lowe's would execute a lease with the plaintiff, and the P&S Agreement made Lowe's executing a lease with the plaintiff a condition precedent to closing. However, Lowe's refused to sign the lease agreement and ultimately exercised its option to purchase the property. The plaintiff sued the defendant for fraud and the jury awarded the plaintiff both out-of-pocket and benefit-of-the-bargain damages. The reviewing court explained that, while the defendant "induced [the plaintiff] into signing the P&S Agreement—the contract to buy—the transaction transferring the property was never entered into. [The plaintiff] never bought the property. Therefore, [the plaintiff] did not suffer any losses as a result of owning the property." *Id.* at 464. The court held that "the benefit-of-the-bargain measure simply ha[d] no application at all" because the plaintiff could not "recover lost profits flowing from an agreement to purchase property that never closed due to the failure of that agreement's express conditions." *Id.* at 465.

{¶ 46} In *Twin Fires Invest., LLC v. Morgan Stanley Dean Witter & Co.*, 445 Mass. 411 (2005) the court held that, although Massachusetts courts typically award benefit of the bargain damages for fraud, that state had "consistently limited the award of benefit of the bargain damages to cases * * * where the person who was the target of the misrepresentation has actually acquired something in a transaction that is of less value than he was led to believe it was worth when he bargained for it." *Id.* at 425. In *Twin Fires Invest., LLC*, a stockbroker convinced a group of investors to purchase certain shares the stockbroker believed he would receive in a company the stockbroker was about to take public. Prior to the initial public offering, the stockbroker learned he would not receive the shares. However, on the afternoon of the initial public offering, the stockbroker " 'congratulated' " the investors and "appeared to accept" their order to sell the shares. *Id.* at 418. The stockbroker eventually told the investors he had no shares to sell them. The investors filed an action against the stockbroker for fraud claiming they were entitled to $12 million in benefit-of-the-bargain damages. The reviewing court explained that the investors were limited to recovering the "pecuniary loss [they] actually suffered as a result of the misrepresentation, rather than the 'loss' claimed from disappointed expectation." *Id.*

at 426. The court noted that the stockbroker's fraudulent misrepresentations "did not lead the [investors] to purchase something that was worth less than represented. [The investors] did not acquire anything, nor did [they] pay for anything [they] did not want. [They] 'lost' only the opportunity to make a considerable profit on securities [they] did not own." *Id.* at 426.

{¶ 47} Plaintiffs rely on two cases—*Am. Family Serv. Corp. v. Michelfelder*, 968 F.2d 667 (8th Cir.1992) and *Nordyne, Inc. v. Florida Mobile Home Supply*, 625 So.2d 1283 (Fla.App.1993)—to support their contention that benefit-of-the-bargain damages are available in situations "where the fraud prevented the plaintiff from reaping the benefits of future commercial transactions." (Appellee's Brief at 35.) For the reasons that follow, we do not find either case persuasive.

{¶ 48} In *Michelfelder*, the American Family Service Corporation ("American Family") entered into negotiations with Pamela and Ted Michelfelder to purchase their childcare business. The Michelfelders and American Family executed a letter of intent regarding the sale that included a "no-shop clause." *Id.* at 669. The no-shop clause precluded the Michelfelders from negotiating with any party other than American Family. However, the Michelfelders began negotiating with another individual and ultimately executed an "agreement in principle" for the other individual to purchase their business. *Id.* American Family sued the Michelfelders for fraud and breach of the no-shop clause. The trial court limited American Family to its out-of-pocket damages on its fraud claim. The reviewing court reversed, noting that Iowa law permitted benefit-of-the-bargain damages on a claim for fraud. The reviewing court also noted that, "if the Michelfelders had dealt exclusively with [American Family] as they promised" in the no-shop clause, American Family "would have bought the Michelfelders' child care business and benefitted financially." *Id.* at 671.

{¶ 49} In *Michelfelder*, the no-shop clause was a consummated contract between American Family and the Michelfelders. As such, American Family was entitled to recover the benefit of its bargain resulting from the no-shop clause, and the evidence demonstrated that the Michelfelders would have sold their business to American Family had the Michelfelders honored the no-shop clause. In the present case, plaintiffs never had a contract with the sellers of the Star King Portfolio, let alone a contract for the sellers to

negotiate exclusively with plaintiffs. As such, we do not find *Michelfelder* applicable to the present case.

{¶ 50} The *Nordyne, Inc.* case does not contain a statement of the facts underlying the dispute between the parties. The decision indicates that Florida Mobile Home Supply ("FMHS") was distributing Nordyne's product, and Nordyne "made false statements to FMHS regarding * * * its intent to continue to permit FMHS to distribute its product." *Id.* at 1285. FMHS sued Nordyne for fraud and sought its lost future profits as damages. The reviewing court stated that Florida law "permit[ted] the court to use either the 'out-of-pocket' or the 'benefit-of-the-bargain' rule, depending upon which is more likely fully to compensate the injured party." *Id.* at 1286. *See DuPuis v. 79th Street Hotel, Inc.*, 231 So.2d 532 (Fla.App.1970). The *Nordyne, Inc.* court concluded that, but for Nordyne's fraudulent misrepresentations, "FMHS would have continued, for at least the next five years, to enjoy annual profits, as it had for many years." *Id.* at 1287. The court found the evidence of FMHS's lost future profits "relevant under the 'out-of-pocket rule,' because it tended to prove the position that FMHS would have been in but for Nordyne's wrongful acts." *Id.* at 1287. The court further stated that, "[t]o the extent that the evidence may be characterized as relevant only to the 'benefit-of-the-bargain rule,' we do not believe that the trial court abused its discretion by admitting it, on the theory that evidence of such damages was necessary to achieve justice." *Id.* at 1287.

{¶ 51} We do not find *Nordyne, Inc.* to be reliable or persuasive. Initially, because the *Nordyne, Inc.* decision does not contain a statement of facts, the full context of the relationship between Nordyne and FMHS is unclear. *Nordyne, Inc.* also incorrectly identifies FMHS's lost future profits as out-of-pocket losses. *See Elliott*, 811 F.Supp. at 591 (stating that "[o]ut-of-pocket expenses do not include lost profits"). Finally, at least one other Florida appellate court has followed the general rule that benefit-of-the-bargain damages are not available for fraud absent a consummated transaction between the parties. *See Greater Coral Springs Realty, Inc. v. Century 21 Real Estate of Southern Florida, Inc.*, 412 So.2d 940 (Fla.App.1982).

{¶ 52} In *Greater Coral Springs Realty, Inc.*, the appellant, Greater Coral Springs Realty, spoke with a Century 21 employee about acquiring another Century 21 franchise. The Century 21 employee "gave assurances that the next available franchise would be

granted to appellant along with an exclusive in the Coral Springs area. Based upon this representation, appellant's vice president made a deposit of two thousand dollars to reserve the franchise." *Id.* at 940. Subsequently, Century 21 refunded the appellant's money and granted the franchise to another broker. *Id.* The appellant sued Century 21 for fraud and the trial court awarded the appellant nominal and punitive damages. The reviewing court affirmed, explaining that the "[f]ailure to establish the contract [between appellant and Century 21] limited appellant to tort remedies for the fraud and precluded recovery of the 'benefit of the bargain.' " *Id.* at 941. The court noted that an "award of lost profits, the equivalent of the performance of the bargain, was clearly not warranted under the facts of this case since the parties never reached an agreement." *Id.* As such, the reviewing court concluded that the trial court "properly awarded nominal and punitive damages." *Id.*

{¶ 53} Based on our review of this issue, we agree with appellants and find that plaintiffs were not entitled to recover benefit-of-the-bargain damages for their fraud claim. *Burke* and Restatement § 549, as well as numerous out-of-state decisions, demonstrate that when a defendant is liable to a plaintiff for fraud but there is no contractual agreement between the parties, the plaintiff is limited to recovering their out-of-pocket losses. This conclusion comports with the general rule that tort damages should restore the plaintiff to the position they were in before the defendant's tortious conduct occurred. *Motorists Mut. Ins. Co.*, 2022-Ohio-841 at ¶ 27; *Keiber v. Spicer Constr. Co.*, 2d Dist. No. 98CA23, 1999 Ohio App. LEXIS 2391, *22-23 (May 28, 1999), quoting 4 Restatement of the Law, Torts 452, Section 901, Comment a (noting " 'the law of torts attempts primarily to put an injured party in a position as nearly as possible equivalent to his position prior to the tort' "). When the defendant is liable to the plaintiff for fraud and the parties have a consummated contract, the plaintiff may recover benefit-of-the-bargain damages from the defendant. Where the plaintiff has not entered into a bargain or contract with the defendant, however, benefit-of-the-bargain damages do not "naturally and proximately result[]" from the defendant's fraud. *Burr*, 23 Ohio St.3d at 74.

{¶ 54} In response to appellants' motions for directed verdict, plaintiffs argued that they had a contract with Mr. Brown because Mr. Brown agreed to be their real estate agent. (Tr. Vol. 8 at 1754.) Plaintiffs never claimed to have a consummated contract to purchase the Star King Portfolio. As such, plaintiffs were not entitled to receive damages that would

give them the benefits of a bargain to purchase the property. Even if we accept plaintiffs' contention that Mr. Brown's fraudulent statements prevented them from submitting a successful bid for the Star King Portfolio, plaintiffs still lost only *the opportunity* to make a profit from the property. Plaintiffs never bought the property and never suffered any losses as a result of owning the property. Plaintiffs were free to use the more than $12 million they did not expend on purchasing the Star King Portfolio to purchase other property or make other investments. As such, plaintiffs were not entitled to receive benefit-of-the-bargain damages on their fraud claim, and instead were limited to recovering their out-of-pocket losses resulting from the fraud and any punitive damages they could have established. *See Curran v. Vincent*, 175 Ohio App.3d 146, 2007-Ohio-3680, ¶ 20 (1st Dist.) (noting that "[f]raud can lead to both compensatory damages and punitive damages").

{¶ 55} While the trial court allowed plaintiffs to present benefit-of-the-bargain damages evidence at trial, the court did not prevent plaintiffs from presenting evidence of their out-of-pocket damages. Prior to trial, plaintiffs argued they were entitled to recover "*both* the benefit of the bargain and out of pocket expenses due to Defendants' tortious conduct." (Emphasis added.) (Memo in Opp. to Mot. in Lim. at 6-7.) Yet, plaintiffs chose to present only evidence pertaining to their benefit-of-the-bargain damages at trial. *Compare Burke*, 1977 Ohio App. LEXIS 8099 at *18 (noting that Burke presented evidence demonstrating his "total out-of-pocket losses * * * could not have exceeded $ 166,504.76," but the jury "impermissibly considered Burke's lost profits" to arrive at its verdict of $213,000); *Roboserve, Inc.*, 78 F.3d at 274-75 (concluding that the "jury's $ 1 million verdict * * * obviously included benefit-of-the-bargain damages," because Roboserve's evidence demonstrated it incurred only $37,810 in out-of-pocket losses resulting from the fraud); *LHC Nashua Partnership, Ltd.*, 659 F.3d at 465 (vacating the "jury's award of $25,500,000 in lost-profits damages," and affirming that "jury's award of $534,380 in out-of-pocket damages," because the plaintiff could only recover its out-of-pocket losses resulting from the fraud).

{¶ 56} Because plaintiffs failed to present any evidence to establish their out-of-pocket damages, and benefit-of-the-bargain damages are not available under these circumstances, plaintiffs failed to establish the injury element of their fraud claim. The trial court therefore erred by failing to grant appellants' motions for directed verdict and JNOV

on plaintiffs' fraud claim.  *See Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 154 (9th Dist.1996) (noting that because "Textron failed to prove elements essential to its tort claims," the "trial court erred in failing to grant Nationwide's motions for directed verdict and judgment notwithstanding the verdict").

{¶ 57} Based on the foregoing, we sustain Mr. Brown's and The Wagenbrenner Company's first assignment of error and Mr. Wagenbrenner's fifth, sixth, and eleventh assignments of error.  Our ruling on these assignments of error renders appellants' remaining assignments of error moot.  *See* App.R. 12(A)(1)(c).  We remand for the trial court to enter judgment in favor of appellants on plaintiffs' fraud claim.

## IV. Conclusion

{¶ 58} Having sustained Mr. Brown's and The Wagenbrenner Company's first assignment of error, and Mr. Wagenbrenner's fifth, sixth, and eleventh assignments of error, thereby rendering the parties' remaining assignments of error moot, we remand the case to the Franklin County Court of Common Pleas for proceedings consistent with this decision.

*Judgments reversed*; *case remanded*.

MENTEL, P.J. and LELAND, J., concur.

———————————